[Cite as *In re K.S.J.*, 2026-Ohio-2214.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MONROE COUNTY


IN RE

K.S.J. et al.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 MO 0007

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division
of Monroe County, Ohio
Case No. 2024 DNA 6215

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Rhonda G. Santha*, for Appellant and

*Atty. James L. Peters,* Monroe County Prosecuting Attorney, *Atty. Jamie A. Riley Pointer*, Assistant Prosecuting Attorney, for Monroe County Department of Jobs and Family Services, Appellee.


Dated: June 11, 2026

**Robb, J.**

**{¶1}** Appellant (the father) appeals the dispositional decision of the Monroe County Common Pleas Court, Juvenile Division, granting custody of four children (K.S.J. et al.) to Appellee (the mother) while providing the father with the court's standard order of visitation. These children were previously removed from the father's care, adjudicated dependent, and placed in the protective supervision and temporary custody of the Monroe County Department of Job and Family Services (the agency). The final dispositional issue involved competing claims for custody by each parent.

**{¶2}** The father contests the court's decision on the children's best interests. He also argues the court committed plain error in failing to sua sponte appoint a guardian ad litem because the action originally included a neglect allegation, but where the claim of neglect was dismissed upon his agreement to the dependency adjudication. For the following reasons, the trial court's judgment is affirmed.

<u>STATEMENT OF THE CASE</u>

**{¶3}** On April 17, 2024, the agency removed the four children from the father's care and filed a complaint alleging the children were neglected and dependent. The ages of the children were six, four, three, and one. According to the allegations in the complaint, the agency investigated a report on March 20, 2024 about the father leaving the children alone in the dark. An interview was attempted by the agency caseworker, but the children were either uncooperative or too young. The caseworker later visited the father's home on April 2, 2024 to find trash, old food, dirty dishes, and gnats throughout the home along with dirty diapers on the floor. Two days later, the home was cleaner. Within two weeks, the home was again found to have trash, dirty diapers, food, and drinks throughout (including empty cans of alcoholic beverages said to be accessible to the children). It was additionally learned the oldest child had been absent from school for weeks. The child seemed healthy and full of energy, but upon inquiry, the father said the child was sick.

**{¶4}** The court issued an ex parte shelter care order. (4/17/24 J.E.). The parents appeared the next day and received appointed attorneys. As requested in the complaint,

the court granted emergency temporary custody of the two youngest to the agency and emergency temporary custody of the two oldest to the maternal grandparents subject to protective supervision. (4/18/24 J.E.) (with findings on reasonable efforts, best interests, and least restrictive alternative).

{¶5} At the next hearing, the court continued the matter for three weeks while stating counsel anticipated the father would enter an admission, waive certain time requirements, and proceed directly to disposition at the rescheduled hearing. (5/10/24 J.E.). A case plan signed by the father was filed, which disclosed the goal for the two oldest children was reunification with a parent and the goal for the two youngest children was reunification with a parent but with a concurrent goal of legal custody to a relative. The father was to complete drug and alcohol counseling, keep a safe and clean home, maintain employment, submit to urine screens before visits (and randomly), and ensure school-aged children were attending school. (5/14/24 C.Plan).

{¶6} At the May 31, 2024 hearing, the father entered an admission to one count of dependency. In exchange, the neglect counts were dismissed by the agency.

{¶7} Upon the dependency adjudication, the court adopted the parties' recommendation to release the two older children to the father with the agency's protective supervision and the mother's visitation every other weekend and the recommendation to maintain the younger two children in the temporary custody of the agency with a goal of reunification with the father. *See* R.C. 2151.35(A)(1) (adjudication), (B)(3) (disposition); R.C. 2151.353(A)(1) (protective supervision), (2) (temporary custody). The court advised the father that if the children had to be removed again, the agency might be forced to seek a more stable placement. (5/31/24 J.E.) (with findings on best interests, reasonable efforts, and least restrictive alternative); *see* R.C. 2151.353(I), citing R.C. 2151.419.

{¶8} Prior to the first review hearing, the agency filed an emergency motion to modify seeking the immediate removal of the older children from the father's custody. It was alleged he was increasingly uncooperative with the agency and service providers to such an extent that it was in the children's best interests to be placed in the agency's temporary custody. The court granted the motion. (7/30/24 J.E.).

{¶9}   At the review hearing, the court ordered all four children to remain in the agency's temporary custody but to begin a month-long visit with the mother.  The father was granted visitation at the agency and ordered to provide urine screens to his counselor upon request.  The case was set for an evidentiary hearing.  (8/2/24 J.E.) (with findings on reasonable efforts, best interests, and least restrictive alternative).

{¶10}  After the evidentiary hearing, the court ruled the children should remain in the agency's temporary custody for at least another 30 days while they continue to reside with the mother and her parents.  The court granted the father unsupervised visitation every weekend from Friday at 6 p.m. until Sunday at noon.  The court ordered the father to maintain sobriety, continue counseling, and promptly provide urine screens to the counselor and to the agency upon request.  (8/23/24 J.E.) (with findings on reasonable efforts, best interests, and least restrictive alternative).

{¶11}  An updated case plan was filed, which noted the concurrent goal of legal custody to a relative was extended to all four children (in addition to the goal of reunification with a parent).  The father's case plan requirements were maintained with the addition of attending in-person AA meetings two nights a week.  He was also warned that any failure to submit to a requested urine screen would be a presumed positive test result.  It was opined he failed to address sobriety, noting an empty beer bottle was observed outside his home on the day of the last hearing.  The mother was asked to maintain her job so she was financially able to ensure the care of her children.  (8/29/24 C.Plan).

{¶12}  The next case plan filed memorialized the children's placement on an extended visit with the mother, who was viewed as becoming more independent and playing a positive role in the children's care.  It was noted the father had injuries and was taking pain medication with codeine.  (10/9/24 C.Plan).  After a status hearing, the court ordered the parties to maintain the status quo with all four children in the agency's temporary custody and visitation as arranged by the agency.  (10/11/24 J.E.) (with findings on reasonable efforts, best interests, and least restrictive alternative).

{¶13}  The father obtained a continuance of the November 2024 dispositional hearing, asking for the next hearing to proceed as a review hearing and stating the parties

were negotiating a shared parenting agreement.  (11/19/24 J.E.).  A January 17, 2025 evidentiary hearing was also canceled.  (1/16/25 J.E.).

{¶14}  In a February 10, 2025 request for a hearing, the agency noted it terminated the visitation the parents were being allowed to exercise and instituted visitation at the agency due to several issues that were not reported by the parties to the agency (as the children's custodian).  A dispatch summary was attached memorializing the following instances of police involvement:  an October complaint by the mother about the father withholding two children; a December complaint by the father about the children being returned late and the oldest child being injured by an older half-sibling at the mother's house wherein the father claimed the agency told him not to report issues between the children and then the father failed to respond when an officer arrived to take a report; and a February complaint by the father saying the agency was threatening him and saying he was the one violating an order but he believed the mother was the violator.

{¶15}  The agency filed an updated case plan adding a requirement of mental health assessments for the parents with instructions to follow the recommendations of the assessor.  It was pointed out the parents failed to follow simple visitation plans and failed to notify the agency of visitation issues, medical needs, and injuries.  The father's AA requirement was amended to require proof of attendance.  The court was asked to journalize the case plan as an order.  (2/13/25 C.Plan).

{¶16}  After a February 2025 status hearing, the court terminated the agency's temporary custody but granted the agency protective supervision while ordering the temporary custody of the oldest two children to the father and the temporary custody of the youngest two children to the mother.  The court ordered visitation would proceed by each parent having all four children on alternating weekends.  This arrangement was to proceed until the March hearing.   (2/21/25 J.E.).

{¶17}  The court granted the parties leave to file objections to the latest case plan, and both parents did so.  The mother noted the agency willingly relinquished custody at the hearing and raised no concern justifying a mental health assessment for her.  The father also said the mental health assessment was unjustified and complained about his AA requirements.  The court sustained the parents' objections and ordered the case plan amended.   The agency was instructed to eliminate the requirement that the parties

Case No. 25 MO 0007

receive mental health assessments or additional counseling and eliminate the requirement that the father attend AA meetings. (2/28/25 J.E.).

{¶18} At the March 28, 2025 final dispositional hearing, the judge announced he was taking judicial notice of the prior proceedings in the case, which would not need to be rehashed during the hearing, and the sole issue was the best interests of the children. (Tr. 3). The agency and each parent's attorney agreed with the court's assessment. *Id.* at 3-4.

{¶19} Each parent asked for custody of all four children, who were aged seven, five, four, and two at the time of the hearing. The agency recommended the father receive custody of the two oldest, the mother receive custody of the two youngest, and they alternate weekend visitations with all four children together, which was the arrangement the parties had been most recently utilizing. The agency asked for six more months of protective supervision. Caseworkers involved with the case testified regarding the recommendation, the case plans, and the children. *Id.* at 28-34, 39-73, 96-156.

{¶20} The first caseworker pointed out the children did well during the extended visitation with the mother starting in the summer 2024. She noted the mother transported the children to school when she had them. As to the father, the caseworker pointed to August 2024 testimony about adding the requirement of in-person AA meetings to his case plan. She explained arriving for a scheduled home visit to find "chaos" in the house regarding the children's play while the father was watching an AA meeting (in the background) and then attending a phone counseling session. She said the father had been sending her verifications of AA meetings so she asked for it to be added to the case plan but with an in-person requirement. When she left the agency in September 2024, she had no concerns with the homes of either parent and reunification with the father was the goal. *Id.* at 28-34.

{¶21} The second caseworker testified the father was only somewhat cooperative regarding the case plans, often engaging in "push back" and "a lot of arguing." She testified the father was not compliant with his urine screen obligations, sometimes delaying or failing to appear for screens. She noted the father's concerns about the two half-siblings but also noted the mother and her parents made assurances of added supervision. This caseworker noted that the mother made improvements in being

involved with the children, ensuring the children's needs were met, and communicating. She also emphasized the mother had a good support system with her parents. She believed the recommended two-two split was in the children's best interests and would result in less chaos and more structure in the home. *Id.* at 39-73.

**{¶22}** The third caseworker testified the father would not provide a release for the agency to review his counseling records to ensure case plan compliance (to complete drug and alcohol treatment) throughout the case until just prior the hearing (even though counseling requirements existed since May 2024 and were not amended by the court until February 2025). *Id.* at 96, 104-107. She noted the father's house was messy (to the point of clutter impeding the children's ability to move around freely) and remained in that condition even when he did not have the children. *Id.* at 105. She had concerns about late rent payments and the condition of the father's van. *Id.* at 113, 116. She additionally expressed apprehension with the father's request for custody of all four children as he "becomes overwhelmed" and she feared the situation "would be back where we started." *Id.* at 107-108, 147.

**{¶23}** This caseworker also had concerns the mother may become overwhelmed with custody of all four kids but pointed out the mother did well during an extended trial period and she had support. *Id.* at 108, 119. This witness confirmed the mother and the maternal grandparents were taking extra precautions regarding the half-siblings, and she characterized the issues as brothers getting on each other's nerves (noting she saw the bickering siblings playing videogames together in the past while the younger three children played together). *Id.* at 108-111. She described the mother's home as always well maintained with plenty of room to play. *Id.* at 111-112. The mother and the parties' four children had beds in the basement living area. *Id.* at 105-106.

**{¶24}** As for the two-two split custody recommendation, she said this allowed more individualized parental attention for each child during the week and said improvements were observed after this split residency started. She pointed to the oldest child's return to the classroom (from placement in a special behavior room) and the youngest children's improved speech or vocabulary. *Id.* at 96-98. She acknowledged the children were upset with the Sunday transitions (when the group was split into older-younger pairs). *Id.* at 152.

**{¶25}** The agency's February 2025 concerns were explained: neither parent informed the agency (who had temporary custody) that the children were sick, not attending school, and not being transferred in accordance with the scheduled visitation; the agency wanted to ensure the children were actually sick (alluding to the agency's original involvement on the oldest child's lengthy absence from school when the father claimed the child was sick); and when the father was noncompliant with an agency order, he would declare the mother violated an order allowing him to violate it as well. *Id.* at 99-102, 128.

**{¶26}** Testimony was also presented by father's counselor, who was engaged as part of the case plan. After being screened by a practitioner, the father was expected to attend counseling weekly and provide a urine sample at each appointment. The father scheduled seventeen appointments but only attended four (and three of these were telehealth with no urine samples). He appeared once for a group meeting and provided a urine sample but could not participate in the meeting because he brought the children with him. The provider was unable to arrive at a diagnosis or treatment plan due to the limited visits. The counselor confirmed the father would not sign a release for the agency until just prior to the hearing. The father also failed to verify any prior counseling (to support his claim that he should have been allowed to start with only monthly counseling). *Id.* at 81-91.

**{¶27}** A police officer testified that he responded to the December 2024 call wherein the father sought to file a report while alleging the oldest child was choked by a half-sibling while at the mother's house. When the officer arrived at the father's house to take the report, the father's van was in the driveway but the officer's knocks went unanswered. *Id.* at 6-11, 50, 66.

**{¶28}** Another officer testified about responding to the father's March 16, 2025 call alleging his child was kicked by a child living in the mother's household. When the officer arrived at the mother's house, the mother was making dinner. He viewed the children and saw no marks on them, including on their arms or legs. *Id.* at 13-15, 18, 20. A caseworker visited the subject child the next day, saw no marks, and found him "bubbly" and happy. *Id.* at 109, 129.

{¶29} A few days later, this officer initiated a traffic stop of a van with a loud muffler displaying license plates that did not match the vehicle. He did not know it was the father's van before the stop but found the father driving with the subject children as passengers. The father said he had been using the plates for two months. The officer issued citations for the excessive muffler noise and the fictitious plates. The van's front end had heavy damage with one of the headlights missing, but a citation was not issued for this flaw, as it was not fully dark when the stop was made. The officer had the van towed and offered the father and his children a ride home, noting it was dark by that time, but the father said they would walk home. *Id.* at 15-26.

{¶30} The parties stipulated to the admission of a letter from the father's employer that he was employed part-time. *Id.* at 160. The father then called the children's physician as a witness. He testified about the children's last well visits. He also testified about diagnosing the oldest child with RSV on January 31, 2025 (after viewing emergency room records showing the other three children tested positive for RSV). Then, on February 4, 2025, all four children tested positive for Covid and he provided a note saying they could return to school on February 10, 2025. *Id.* at 162-166.

{¶31} The father's landlord testified he had no intent to evict the father, who has rented the residence for five years. He acknowledged the father was, at times, behind in paying his $650 per month rent (once owing $3,000). *Id.* at 169-174.

{¶32} A representative from a preschool testified the father went to meetings in the past. The father then withdrew consent for services for the second oldest child, who was recently returned for evaluation. This witness noted the father also tried to have a different child enrolled over whom he did not have custody. *Id.* at 178-181.

{¶33} An elementary school principal testified about the oldest child's struggles with reading and behavior, including throwing items, yelling, refusing to work, and other disruptions (similarly documented in records from his prior school). *Id.* at 196-201.

{¶34} A Head Start representative testified child three was receiving speech services and was thriving. She described the child as a "Mom's girl" but was also comfortable with classmates and the teacher. The child was always clean and prepared. It was opined the mother is loving, generous with her smiles, hugs, and kisses for the child, is "on task," and does "a very good job" with the child. This witness noted the father

called her to attempt to transfer the child away from the agency; the father claimed his sister had a Head Start program, which this witness testified was not true. She described the father as very aggressive and pushy. *Id.* at 206-217.

**{¶35}** A provider from Early Head Start testified to providing weekly in-home services to the youngest child, who was making "great leaps" socially, emotionally, and developmentally. She described the mother as cooperative and "great" about scheduling or rescheduling. She complimented the mother's interaction with the children and said the mother's home was clean and safe. She opined it was in the child's best interest to stay in the program as long as possible. *Id.* at 221-225.

**{¶36}** The father's sister testified she runs a daycare and receives a state subsidy for her care of the two oldest children (who were in the father's temporary custody). Recently, she had these children every day before and after school and provided them transportation to and from school. She had space for the youngest two children should the father obtain custody. *Id.* at 187-190.

**{¶37}** The mother testified to her involvement in the children's lives, noting she plays, colors, jumps on the trampoline, and takes walks with the children. In discussing the children's best interests and seeking custody of all four children, she testified she would start the oldest two children in counseling to assist with their transition. She also pointed out she would meet their transportation needs and make sure their schooling and medical needs were met. As to the two older half-siblings of the four children at issue, the mother said she voluntarily gave her custody of her thirteen-year-old son to her parents when she last moved in with the father, and the agency gave custody of her ten-year-old daughter to her parents when she moved in with the father. *Id.* at 233-239. After the hearing, the court took the matter under advisement.

**{¶38}** On April 3, 2025, the court issued its custody decision. The court noted the parties tried a split arrangement similar to shared parenting but could not come to an agreement on a shared parenting plan despite ample opportunity to do so. It was pointed out neither parent was requesting to continue the split arrangement (with all four children

together every weekend alternating between the parents). The court was not satisfied the agency-recommended split was in the *children's* best interests.[1]

**{¶39}** In determining custody, the court made observations related to various best interest factors, citing R.C. 3109.04(F). The court then granted custody to the mother and provided the father the court's standard order of visitation (one weekday from 6 p.m. to 9 p.m. and every other weekend from 6 p.m. on Friday to 6 p.m. on Sunday).[2]

**{¶40}** The agency was provided 60 days of protective supervision. (4/3/25 J.E.); (6/10/25 J.E.) (protective supervision terminated effective June 4, 2025). The court ordered the parents to report to the child support enforcement agency for a calculation of child support and medical coverage. (4/3/25 J.E.) (reiterating prior findings on the agency's reasonable efforts to reunify and concluding the order was the least restrictive alternative available).

**{¶41}** On April 16, 2025, the father attempted to appeal the April 3, 2025 entry, but this court explained it was not a final appealable custody order until the ordered child support adjudication was finalized. We dismissed the appeal for lack of jurisdiction, advising him to file a new notice of appeal once the final order was entered. *In the Matter of K.S.J.*, 25 MO 0003 (5/6/25 J.E.).

**{¶42}** The administrative child support calculation was filed on July 21, 2025. The accompanying order provided the parties 14 days to object before the court would adopt the calculation. (7/21/25 J.E.). No objections were filed.

**{¶43}** On August 11, 2025, the trial court adopted the child support calculation due to the lack of objections, pointed to the April 3, 2025 order, and declared the child support order complete. The court labeled this judgment, "Certification as Final Appealable Order." The court also ordered the clerk to send certified copies to the parents and to this court ("as part of further proceedings previously indicated in this matter"). No appeal was filed.

---

[1] The court's decision refusing the agency's recommendation (to split the children between the parents) is not at issue on appeal. Pointing out each parent asked for custody of all four children, the court acknowledged the concern that each parent had some difficulty managing the children as a unit but noted this was to be expected. In finding the split would not be in the children's best interests, the court said their young ages and proximity in age called for them to remain together as a family unit.
[2] The court thereafter modified the visitation by allowing the youngest child to join the father for half of the summer break (a variance from the standard order applying the summer schedule to children over 4). (7/25/25 J.E.).

**{¶44}** A week later, on August 18, 2025, the juvenile court filed a judgment as if to collect the April custody award and the recent child support calculation into one order. The court confirmed the matter was closed and included a red-stamped notice stating, "Final Appealable Order No Just Cause for Delay" (although Civ.R 54(B) language was unnecessary where no issues remained pending) (8/18/25 J.E.) (original all caps). The parties who were to receive a copy of the judgment were listed (after "cc"). *Compare* Civ.R. 58(B) ("Notice of Filing. When the court signs a judgment, the court shall endorse thereon a direction to the clerk to serve upon all parties not in default for failure to appear notice of the judgment and its date of entry upon the journal."). No appeal was filed.

**{¶45}** On September 12, 2025, the juvenile court essentially refiled the last judgment, after adding "nunc pro tunc" to the heading and correcting a typographical error in a date (changing April 8 to April 3). (9/12/25 J.E.) (signed the same date it was filed). This judgment was entered *the day after* the appellate time would have expired if the August 11 entry constituted a properly served final order.

**{¶46}** A nunc pro tunc entry does not extend the time for filing an appeal from the original judgment so as to create a new final appealable order. *State v. Bonnell*, 2014-Ohio-3177, ¶ 31 ("a sentencing entry that is corrected by a nunc pro tunc entry incorporating findings stated on the record at the sentencing hearing does not extend the time for filing an appeal from the original judgment of conviction and does not create a new final, appealable order"), citing *State v. Lester*, 2011-Ohio-5204, ¶ 20 ("a nunc pro tunc judgment entry issued for the sole purpose of complying with Crim.R. 32(C) to correct a clerical omission in a final judgment entry is not a new final order from which a new appeal may be taken").

**{¶47}** On September 22, 2025, the father finally filed a notice of appeal, still represented by his appointed counsel, stating it was an appeal from the April 3, 2025 and September 12, 2025 judgments (without mentioning the August 11 or August 18 entries or the effect thereof). Thirty days from the August 11 entry finalizing child support would have been Wednesday, September 10, 2025. Even assuming the August 18, 2025 entry consolidating the two parts of the judgment could be accepted as the final order, thirty days from that order would have been Wednesday, September 17, 2025.

Case No. 25 MO 0007

**{¶48}** However, if the clerk failed to note service of the court's judgments in the appearance docket after sending notice of the judgments to the parties, the time for appealing the earlier entries would not have expired by the time the notice of appeal was filed. App.R. 4(A)(1)-(3), citing Civ.R. 58(B). "In a civil case, if the clerk has not completed service of notice of the judgment within the three-day period prescribed in Civ.R. 58(B), the 30-day periods referenced in App.R. 4(A)(1) and 4(A)(2) begin to run on the date when the clerk actually completes service." App.R. 4(A)(3).

**{¶49}** The Civil Rule cited in this Appellate Rule states: "Within three days of entering the judgment upon the journal, the clerk shall serve the parties in a manner prescribed by Civ. R. 5(B) and note the service in the appearance docket. Upon serving the notice and notation of the service in the appearance docket, the service is complete." Civ.R. 58(B). It also says, "The failure of the clerk to serve notice does not affect the validity of the judgment or the running of the time for appeal *except as provided in App. R. 4(A).*" (Emphasis added.) *Id.*

**{¶50}** Although the clerk signed a proof of mailing on the date of each judgment, this document or procedure was not then noted in the appearance docket. *See* App.R. 4(A), citing Civ.R. 58(B); *see generally* R.C. 2303.13 ("enter upon the appearance docket" as distinct from placing a signed unstamped document in the file); R.C. 2303.12(A). The Supreme Court has explained: "Civ.R. 58(B) mandates that the clerk of court's office serve the order with an accompanying notation on the appearance docket . . . An office of a clerk of courts exists, if for no other reason, to keep an accurate and easily accessible record of what has happened in any given case." *See Clermont Cty. Transp. Improvement Dist. v. Gator Milford, L.L.C.*, 2015-Ohio-241, ¶ 11. "The 30-day time period to file a notice of appeal begins upon service and notation of service on the docket by the clerk of courts regardless of actual knowledge by the parties." *Id.*

**{¶51}** Juvenile court orders are subject to the tolling mechanism in App.R. 4 citing Civ.R 58. *In re Anderson*, 92 Ohio St.3d 63, 67 (2001) (even in a delinquency case despite the dissent arguing it does not apply to juvenile court proceedings and where a criminal appeal period starts on the day the entry is filed); App.R. 4(B)(2) (listing exceptions to the time for appealing in (A) for certain "Civil or Juvenile Post-Judgment

Motion[s]").  At times, the issue is attributed to the trial court failing to instruct the clerk more specifically on the judgment.  *Gator Milford* at ¶ 3-4; *Anderson* at 67.

**{¶52}** An appellee may ask whether the distinct situation involving a proof of mailing signed by the clerk and placed into the file should be considered sufficient notation in the "appearance docket" (making the father's appeal untimely).  Here, however, it could be observed the father previously filed a premature appeal on the portion of the decision now being challenged (custody).  App.R. 4(C) ("A notice of appeal filed after the announcement of a decision, order, or sentence but before entry of the judgment or order that begins the running of the appeal time period is treated as filed immediately after the entry.").  Also, the father does not challenge the finalizing (child support) portion of the judgment, which rendered the April 3, 2025 announcement of the custody decision final and appealable.  We proceed to address the appeal.

**{¶53}** But first, we address another issue with the appellate proceedings.  The father's docketing statement recognized this was a calendar priority case, citing both App.R. 11.2 (calendar priority for appeal under division (E) concerning dependent child) and R.C. 3109.04(H) (calendar priority for appeal of decision allocating parental rights).  After the notice of appeal was filed, the father requested the transcript of only the final disposition hearing, and we granted his trial counsel's motion for appointment of a different attorney for appeal.  The court reporter received an extension for filing the transcript.

**{¶54}** On January 16, 2026, more than a week after the brief became overdue, the father sought an extension.  The father's brief was then filed on January 20, 2026, and we then granted the extension.  On February 6, 2026, the agency filed a "Notice of Intent to Not File a Brief" as the children were reunified with their parents, the agency's protective supervision was over, and the agency's case was closed.

**{¶55}** Causing further delay in this calendar priority case, it was noticed the certificate of service on the father's brief only said service was made on the assistant prosecutor as the attorney for the agency.  The father's brief failed to certify service was made on the mother or the attorney appointed to her below in violation of provisions in the Appellate Rules.  *See* App.R. 13(B) (requiring service on all parties and limiting the means of service in appeals under App.R. 11.2), (E) "Documents presented for filing shall

Case No. 25 MO 0007

contain an acknowledgment of service by the person served or proof of service in the form of a statement of the date and manner of service and of the names of the persons served, certified by the person who made service."); *see also* App.R. 18(A) (providing 20 days to both *serve* and file the appellant's brief or within an extension), (C) ("If an appellant fails to file the appellant's brief within the time provided by this rule, or within the time as extended, the court may dismiss the appeal."). "Documents filed with the court shall not be considered until proof of service is endorsed on the documents or separately filed." App.R. 13(E).

**{¶56}** Although the agency would have been an appellee as well and was merely notifying this court it would not be filing a brief, we note the mother was not served with that brief either. Nor did the father serve the mother his extension request or other documents filed contemporaneous with the notice of appeal; his praecipe statement, motion for counsel, and motion for transcript at state's expense contained certificates of service on solely the agency's attorney. The clerk is only automatically obligated to serve the notice of appeal and docketing statement per App.R. 3(E).

**{¶57}** Although the failure of an appellant to take any steps after filing the timely notice of appeal does not affect the validity of the appeal, the court of appeals may deem dismissal appropriate due to such failure. App.R. 3(A). The Supreme Court strikes documents that were not properly served upon the other party if, under the rare circumstance, the non-served party was adversely affected. *See generally State ex rel. Ware v. Dept. of Rehab. & Correcti*on, 2024-Ohio-1015, ¶ 11 (applying a practice rule). Considering the history and nature of this calendar priority case, including the fact that the parents' four children have been in the mother's custody since the April 3, 2025 order, this delay could be viewed as highly prejudicial. Nevertheless, on March 6, 2026, this court ordered the father to certify service of his brief on the mother within seven days and set a deadline for the mother's brief if she desired to file one.

**{¶58}** On March 12, 2026, the father filed an amended certificate of service, acknowledging the mother was not previously served with the brief and certifying her appointed counsel was served on March 11, 2026. The mother declined to file a brief. The case was set for non-oral hearing on the first available date.

ASSIGNMENT OF ERROR ONE

{¶59} The father sets forth two assignments of error, the first of which contends:

"The Monroe County Juvenile Court abused its discretion by unreasonably failing to return children to [the father]."

{¶60} A dispositional order of legal custody to a parent is reviewed for an abuse of discretion. *In re M.G.*, 2023-Ohio-3423, ¶ 8 (7th Dist.) (originating from an abuse, neglect, or dependency action). This is the same standard applied in a standard custody dispute between parents in juvenile court or between divorcing parents in domestic relations court. *See, e.g., Davis v. Flickinger*, 77 Ohio St.3d 415, 421 (1997). An abuse of discretion exists if a trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). If the court's decision on the children's best interests or on other factual issues surrounding legal custody is not supported by competent and credible evidence, then the decision may be considered unreasonable. *M.G.* at ¶ 8.

{¶61} The trial court is in the best position to weigh the testimony and observe the demeanor of the witnesses in order to gauge their credibility. *Davis* at 418-419. "This is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Id.* at 419. We do not substitute our judgment for that of the trial judge who occupies the best position to assign weight to the various best interest factors. *See id.* at 417.

{¶62} As agreed below, the father acknowledges the issue before the juvenile court was the best interests of the children. The juvenile court cited R.C. 3109.04(F)(1) and reviewed the best interest factors therein. The father challenges the decision on the best interest factors in deciding to award custody to the mother (accompanied by the court's standard order of visitation to the father).

{¶63} In determining the best interest of a child under the statute cited by the trial court, the court is to consider all relevant factors, including, but not limited to: (a) the parent's wishes; (b) the child's wishes and concerns expressed to the court if, pursuant to (B), an in chambers interview was conducted; (c) the child's interaction and interrelationship with parents, siblings, and any other person who may significantly affect the child's best interest; (d) the child's adjustment to home, school, and community; (e)

the mental and physical health of all involved; (f) the parent more likely to honor and facilitate parenting time rights; (g) any failure to make child support payments and arrearages; (h) whether either parent or any member of the household of either parent previously has been convicted of certain offenses; (i) whether the residential parent or parents with shared parenting continuously and willfully denied court-ordered parenting time; and (j) whether either parent has established a residence or is planning to establish a residence outside of this state. R.C. 3109.04(F)(1)(a)–(j).

{¶64} The father recognizes the juvenile statutes applicable to the dispositional hearing require a best interest analysis. *See* R.C. 2151.415(F) (best interest for returning to parent or legal custody), citing (A)(1)-(5) and R.C. 2151.42(A) (best interest for returning to parent or modifying or terminating any order issued under R.C. 2151.353); *see also* R.C. 2151.353(H)(1) (best interest for extending the agency's protective supervision).

{¶65} The father then notes these statutes do not specifically contain a list of best interest factors, such as those contained in R.C. 3109.04(F)(1), which is the standard custody statute utilized for allocating parental rights. In addition to the best interest factors listed in R.C. 3109.04(F)(1), the father observes a juvenile court awarding legal custody to a parent in a case such as this may also consider the best interest factors within R.C. 2151.414(D)(1), which is the permanent custody statute applicable to terminating parental rights (a topic which has never been at issue in this case).

{¶66} We point out the statute defining the jurisdiction of the juvenile court specifies: "The juvenile court shall exercise its jurisdiction in child custody matters in accordance with sections 3109.04 . . ." R.C. 2151.23(F)(1). At the final dispositional hearing, the matter before the court was competing custody requests by each parent for all four children (with an agency recommendation of the parents splitting custody corresponding to the oldest and youngest children).

{¶67} In addition to any relevant listed factors, the cited standard custody statute allows the court to consider other factors the court believes are relevant. R.C. 3109.04(F)(1) ("consider all relevant factors, including, but not limited to"). As the list of statutory factors in R.C. 3109.04(F) is non-exhaustive, a court may consider the factors

in R.C. 2151.414(D) if it finds them relevant; however, the court is not required to specifically review or cite them.

{¶68} Even so, the clear and convincing evidence standard for the best interest finding within the latter statute is not applicable, as this is not the initial adjudication or a termination of parental rights; instead, the preponderance of the evidence standard applies to the competing custody requests of the parents. *See M.G.* at ¶ 8; *see also* R.C. 2151.414(B)(1). Like R.C. 3109.04(F)(1), the permanent custody statute cited by the father also instructs a court to consider "all relevant factors, including, but not limited to" those listed. R.C. 2151.414(D). The best interest factors in the permanent custody statute includes: the child's interactions and interrelationships; the child's wishes; the child's custodial history; the need for permanence (and whether it "can be achieved without a grant of permanent custody to the agency"); and whether any factors in (E)(7) through (11) apply. R.C. 2151.414(D)(1)(a)-(e), (E) (factors used to show a child cannot or should not be placed with either parent within a reasonable time; none of the specified subdivisions were alleged in this case). The initial best interest factors on this list are similar to those in R.C. 3109.04(F)(1).

{¶69} Turning to the relevant best interest factors, the juvenile court considered the entirety of the case proceedings and the various issues encountered throughout the year, including the custodial history. *See* R.C. 3109.04(F)(1) (non-exhaustive list of relevant factors); *see also* R.C. 2151.414(D)(1)(c) (custodial history). The court explained there was no evidence presented on certain factors, such as child support issues, convictions listed in the statute, a continuous and willful denial of *court-ordered* parenting time, or any plan to move out of state. *See* R.C. 3109.04(F)(1)(g)-(j). The court recited how each parent wanted custody of all four children. The parents no longer agreed with the agency's recommendation to split custody as they had been exercising (so the father had the older two, the mother had the younger two, and all four children were together every weekend, which the parents would alternate). *See* R.C. 3109.04(F)(1)(a) (parents' wishes); *see also* R.C. 2151.414(D)(1)(c) (custodial history).

{¶70} As the juvenile court pointed out, the children were not interviewed in chambers under R.C. 3109.04(B). *See* R.C. 3109.04(F)(1)(b) (the child's wishes and concerns expressed to the court "[i]f the court has interviewed the child in chambers

pursuant to division (B)"). Division (B) cited in (F)(1)(b) says when determining a child's best interest to resolve any issue related to allocating parental rights, "the court, in its discretion, may and, upon the request of either party, shall interview in chambers any or all of the involved children regarding their wishes and concerns with respect to the allocation." R.C. 3109.04(B)(1). If the court interviews a child, then "[t]he court, in its discretion, may and, upon the motion of either parent, shall appoint a guardian ad litem for the child" but "[t]he court first shall determine the reasoning ability of the child . . ." R.C. 3109.04(B)(2). However, the court opined even the oldest child was too young for his wishes to be of much value to the court. *See* R.C. 3109.04(B)(2)(b) (reasoning ability); *see also* R.C. 2151.414(D)(1)(b) (with due regard for child's maturity). The court heard testimony from the oldest child's principal about his educational and behavior issues. The court was also aware of the many days that the child was absent from school in the past year. In any event, no party made a request for an in chambers interview of any child.

{¶71} The court then found the children seemed to have good relationships with their parents, siblings, and other parties who may significantly affect their best interests. The court found the mother's parents provided an additional element of stability in the mother's home, as did the children's two half-siblings. *See* R.C. 3109.04(F)(1)(c) (child's interaction and interrelationship with parents, siblings, and any other person who may significantly affect the child's best interest); *see also* R.C. 2151.414(D)(1)(a).

{¶72} Although the father had concerns one of the half-siblings was too physical with his oldest child, the agency believed the grandparents and the mother were taking extra precautions upon the agency's request. A caseworker viewed the problem as stemming from an ordinary situation of brothers getting on each other's nerves. Although the father called the police to make a record of his allegations, he then did not answer the door when the police came to take an official report and to check on the child. After a different report by the father, a different police officer checked on the children and concluded they seemed fine, as they did the next day when the caseworker visited them.

{¶73} The father also emphasizes although the half-siblings live with the mother and the maternal grandparents, it is the maternal grandparents who are said to have custody of them. Nevertheless, the agency was aware of their custody status, and after supervising the mother during these proceedings, the caseworkers expressed no

continued concern with the situation previously leading to the grandparents' custody. We also point out the mother testified this custody situation was related to her previously moving in with *the father* in the case before us.

{¶74} Moving to other factors, the juvenile court noted there was no evidence showing the children were not adjusted to home, school, and community. *See* R.C. 3109.04(F)(1)(d). Testimony demonstrated the youngest two, who were in the mother's temporary custody prior to the hearing, seemed enthusiastic about the services the mother was coordinating for them. The service providers for the youngest children gave glowing reviews of the mother's interactions with the children. The oldest child, who was in the father's temporary custody prior to the hearing, was having some difficulties at school, albeit not new issues. The father's sister spoke of caring for the two oldest children at her daycare (where she was receiving payment from the state for their care), but her testimony was not enlightening on their adjustment to this new addition to their routine before and after school.

{¶75} The juvenile court believed the mother was the parent more likely to honor and facilitate parenting time rights or visitation while pointing to the father's animosity to the agency and his behavior in court. It was pointed out the father once flatly refused the agency's request to return the children to the mother's house, which again led the agency to remove the children, whereas the mother made better efforts to comply with the case plan. *See* R.C. 3109.04(F)(1)(f).

{¶76} As recognized by the juvenile court, both parents felt overwhelmed at times when caring for all four of these young children at the same time. Both parents were said to be active in the children's health and education. The court pointed to testimony suggesting the mother was more involved in parenting. The juvenile court opined none of the children or parents had significant mental or physical health concerns. *See* R.C. 3109.04(F)(1)(e). However, the court was concerned with the father's history with alcohol, which was a precipitating cause of the situation resulting in shelter care and the complaint. The court also pointed to the inability to develop a treatment plan due to his sporadic substance abuse counseling.

{¶77} On this finding, the father points out the agency's February 2025 updated case plan attempted to add requirements for the father to provide proof of attendance at

Case No. 25 MO 0007

AA meetings and for the parents to receive mental health assessments with instructions to follow the counseling recommendations of the assessor (adding to his pre-existing substance abuse counseling requirements). In response to the parents' objections to this case plan, the juvenile court eliminated the requirement for the parents to receive a mental health assessment or additional counseling and eliminated the requirement for the father to attend AA meetings. (2/28/25 J.E.).

**{¶78}** However, the requirement in the case plan for the father to complete drug and alcohol counseling existed since May 2024. (5/14/24 C.Plan) (plus urine screens before parental visits and randomly, among other requirements). In fact, the court specifically ordered him to maintain sobriety, continue counseling, and promptly provide urine screens to the counselor and to the agency upon request. (8/23/24 J.E.). A subsequent case plan added in-person AA meetings two nights a week. (8/29/24 C.Plan). The father signed those plans and did not lodge objections to them.

**{¶79}** Contrary to his suggestion on appeal, the juvenile court's February 28, 2025 decision (one month before trial) sustaining the parties' objections to the newest case plan did not somehow erase the concerns existing when the children were removed from his care and adjudicated dependent, absolve him from his past failures, release him from unrelated prior obligations, or diminish the importance of the testimony from his substance abuse counselor or the caseworkers. Likewise, the lack of testimony on very recent evidence of him drinking is not dispositive of agency concerns.

**{¶80}** As set forth in our Statement of the Case above, the counselor testified the father regularly missed his scheduled appointments, attending only four out of seventeen; three of these were by phone, resulting in minimal opportunity for urine samples. The father also arrived for a group meeting with the children and thus could not attend after providing a sample. His diagnosis, treatment protocol, and compliance with sobriety could not even be assessed due to his lack of commitment.

**{¶81}** The trial judge heard the witnesses testify and listened to their concerns. The father's outbursts in court confirmed witness testimony describing his personality and other evidence and inferences reasonably drawn therefrom. Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001). After watching the mother testify, the juvenile court was in

the best position to judge her credibility, sincerity, and attitude. *Davis*, 77 Ohio St.3d at 418-419. Credibility issues are critical in custody cases, and important information may be evident from the demeanor and attitude of the parents and witnesses that does not translate into the record. *Id.*

**{¶82}** "[C]ustody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have wide latitude in considering all the evidence before him or her . . . " *Id.* at 418. The juvenile court's decision was supported by competent, credible evidence. The custody decision was not arbitrary, unconscionable, or unreasonable, and thus, the court did not abuse its discretion in granting custody to the mother (accompanied by the court's standard order of visitation to the father). This assignment of error is overruled.

ASSIGNMENT OF ERROR TWO

**{¶83}** The father's second assignment of error provides:

"The Juvenile Court violated Ohio Revised Code 2151.281(B)(1) when it failed to appoint a guardian ad litem."

**{¶84}** The father quotes: "the court shall appoint a guardian ad litem . . . to protect the interest of a child in any proceeding concerning an alleged abused or neglected child and in any proceeding held pursuant to section 2151.414 of the Revised Code [permanent custody statute]." R.C. 2151.281(B)(1). The father also cites a case remanding with instructions to appoint a guardian ad litem for the child where: the child was alleged to be abused, neglected, and/or dependent; the child was *adjudicated neglected* and dependent; the mother did not object to the failure to appoint a guardian ad litem; and the juvenile court changed custody from the mother to the father. *In re A.G.B.*, 2007-Ohio-4753 (4th Dist.) (with one judge writing the opinion, one judge concurring in judgment only, and one judge dissenting).

**{¶85}** This is the extent of the father's minimalist argument. He does not discuss the statutory division stating the court "may" appoint a guardian ad litem in a proceeding concerning "an alleged dependent child" if the court is not required to do so under the

prior division.  *See* R.C. 2151.281(A)(3) (added in 2014).[3]  The statutory division he quotes does not include dependency.

**{¶86}** Moreover, other courts have applied a plain error analysis, rather than automatic reversal, even where a guardian ad litem was required under the quoted division (A).  *See, e.g., In the Matter of K.R.*, 2017-Ohio-7122, ¶ 11 (12th Dist.) (finding no plain error where a guardian ad litem was appointed before the *neglect* adjudication but was not reactivated a year later when the agency filed for *permanent custody* and was thus removed without replacement before the termination of parental rights); *see also In re C.B.*, 2011-Ohio-2899, ¶ 14 (where a child was adjudicated dependent, the Supreme Court observed that after the agency moved to modify temporary custody *to permanent custody*, the juvenile court was required to appoint a guardian ad litem but finding there was no request for independent counsel or claim of conflict).

**{¶87}** In any event, in addition to being non-binding and lacking a majority opinion, the cited *A.G.B.* case is distinguishable as it involved allegations resulting in an adjudicatory trial on the contested allegation of neglect (in addition to dependency) followed by an adjudication of neglect (and dependency).

**{¶88}** The father's argument on appeal relies solely on the fact that the agency's complaint against him originally alleged the children were neglected (and not simply dependent).  Although the trial court was statutorily required to appoint a guardian ad litem for the children as soon as possible after the complaint and prior to any adjudicatory hearing when they were alleged to be neglected, the portion of this case involving the children's status as "alleged . . . neglected" was soon *concluded during the pre-adjudicatory stages by agreement that the children were only dependent*, turning the case into one of only dependency with an agreed dependency adjudication.

**{¶89}** That is, the day after the complaint was filed, the parents appeared in court, the court appointed an attorney for each parent, the court entered a denial for the parents, and a pre-adjudicatory hearing was set to discuss the case once the attorneys were in place.  At that pretrial, the court was informed of an agreement to modify the complaint

---

[3] *Compare* R.C. 2151.281(B)(1) ("alleged abused or neglected") to R.C. 2151.281(A) ("alleged *or adjudicated* delinquent child") and (C) ("alleged *or adjudicated*" child where a parent appears mentally incompetent or parent is under 18).  The emphasis added indicates the child's status of "alleged" terminates or changes upon adjudication.

and continued the pretrial for finalization of the agreement. At the rescheduled pretrial, the agency dismissed the neglect counts, and the father entered an admission to an adjudication of dependency. An agreed disposition was entered (custody of the older two children was returned to the father with protective supervision and the agency exercised temporary custody of the younger two children).

{¶90} After this adjudication and disposition, allegations of neglect were no longer pending, the proceedings were no longer concerning an "alleged" status of the children, and the children were adjudicated only as dependent upon the father's stipulation to this status (along with his stipulation to the initial disposition). The case did not proceed to trial on the adjudicatory issue of dependency (or on the issue of initial disposition), and this was never a permanent custody case involving the termination of parental rights. *See* R.C. 2151.281(B)(1) (alleged abused or neglected child or permanent custody proceedings).

{¶91} Accordingly, any issue with implementing R.C. 2151.281(B)(1) before a pre-adjudicatory hearing was no longer ripe almost a year later at the final disposition hearing (involving previously adjudicated agreed dependent children) where the issue was a determination of custody between two parents, neither of whom sought a guardian ad litem. On the latter topic, no party demanded a guardian ad litem under R.C. 2151.28(B)(1) or any other division; nor was the court asked to use its discretion to appoint a guardian ad litem under R.C. 2151.281(B)(3) (or under R.C. 3109.04(B), discussed under the prior assignment of error).

{¶92} As explained by the Ohio Supreme Court, plain error (even in a criminal case) is a discretionary doctrine the appellate court may employ in exceptional circumstances when required to avoid a manifest miscarriage of justice. *State v. Noling*, 2002-Ohio-7044, ¶ 62. To establish plain error, a party must demonstrate the court committed an obvious error that affected the outcome of the proceeding. *State v. Graham*, 2020-Ohio-6700, ¶ 93, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002); *State v. Rogers*, 2015-Ohio-2459, ¶ 22 ("The [appellant] is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims."); *see also State v. Carter*, 72 Ohio St.3d 545, 557-558 (1995) (ineffective assistance claim requires (1) deficient performance

with strong presumption in favor of counsel without second-guessing strategic decisions and (2) prejudice rendering the result unreliable or the proceeding fundamentally unfair).

**{¶93}** "In applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997).

**{¶94}** Upon reviewing the entire record (as detailed in the prior sections above), this test is not satisfied here. A strategic decision may have been made by the father or his attorney to not seek a guardian ad litem in an agreed dependency case where that parent had a difficult time maintaining a home, cooperating with an agency, and complying with sobriety counseling and where that parent entered an agreement in order to re-obtain custody of two of the children with a plan to seek custody of the other two children. A manifest miscarriage of justice would not result from affirming the April 3, 2025 custody award. Public confidence in the judicial system would not be adversely affected by a refusal to remand to appoint a guardian ad litem for children adjudicated dependent by agreement; rather, it would be a rehearing of the custody case between two parents that would have an adverse effect on confidence in the system.

**{¶95}** Plain error is not apparent, and the father's assignment of error does not analyze plain error. To the extent the father urges the violation of the mandatory language in the statute requires automatic reversal, we point out the Ohio Supreme Court explained that the mere fact that a statute imposes a mandatory duty does not mean the failure to perform the duty is automatically reversible (which would entail a structural error analysis). *State v. Mills*, 2023-Ohio-4716, ¶ 12-14 (with all justices confirming the failure to conduct a competency hearing *may be* harmless error even though a statute with mandatory language requires a competency hearing when the issue is raised before a criminal trial), applying *State v. Bock*, 28 Ohio St.3d 108, 109-110 (1986) (failure to hold a statutorily mandated competency hearing is not a basis for automatic reversal; reversing the appellate court's remand for a new trial).

**{¶96}** Structural error, which defies a harmless error analysis, can only be raised where there is a constitutional defect, not a mere statutory defect. *State v. Perry*, 2004-Ohio-297, ¶17, 24 (where the Supreme Court reversed the appellate court's decision that the failure to comply with a mandatory statute required reversal). Moreover, "to hold that an error is structural even when the defendant does not bring the error to the attention of the trial court would be to encourage defendants to remain silent at trial only later to raise the error on appeal where the conviction would be automatically reversed." *Id.* at ¶ 23 ("our holdings should foster rather than thwart judicial economy by providing incentives (and not disincentives) for the defendant to raise all errors in the trial court—where, in many cases, such errors can be easily corrected"). In accordance, this assignment of error is overruled.

**{¶97}** For the foregoing reasons, the trial court's decision granting custody to the mother is affirmed.


Waite, P.J., concurs.

Dickey, J. concurs.

Case No. 25 MO 0007

[Cite as *In re K.S.J.*, 2026-Ohio-2214.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division of Monroe County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**